UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
EASTMAN KODAK COMPANY,                  :
                        Plaintiff,      :
                                        :      11 Civ. 6036 (DLC)
            -v-                         :
                                        :      OPINION & ORDER
ASIA OPTICAL CO., INC.,                 :
                        Defendant.      :
                                        :
----------------------------------------X

APPEARANCES:

For Plaintiff:

Robert J. Gunther
Michael J. Summersgill
Jordan L. Hirsch
Jonathan W. Woodard
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY 10022

For Defendant:

Mark S. Sullivan
Sumiko Soekawa
Devan V. Padmanabhan
Sri K. Sankaran
Dorsey & Whitney LLP
51 West 52nd Street
New York, NY 10019


DENISE COTE, District Judge:

    Plaintiff Eastman Kodak Company ("Kodak") brings this

action to recover royalties it claims it is owed pursuant to a

patent licensing agreement with defendant Asia Optical Company,

Inc. ("AO").  On December 16, 2011, Kodak moved for partial

summary judgment on the issue of whether the licensing agreement between the parties requires AO to pay Kodak royalties on AO's digital camera sales to Fujifilm ("Fuji").[1]  Kodak's motion is granted.

Background

The following facts are undisputed unless otherwise noted. Kodak has more than 1,000 patents related to digital camera technology.  It licenses its patents to digital camera manufacturers, including both companies that market digital cameras under their own brand name and companies that primarily assemble cameras for sale under other companies' brand names. AO, a Taiwan corporation, is the latter type of company.  In April 2009, Kodak and AO entered a licensing agreement whereby Kodak licensed its full set of digital camera patents to AO and AO agreed to pay royalties on the sales of certain digital cameras it manufactured.

Two documents must be considered to analyze the scope of the licensing agreement between the parties.  The first, a Patent License Agreement ("PLA") signed by the parties on April 9, 2004, licenses Kodak's digital camera patents to AO in

---

[1] Fujifilm Holdings Corporation, Fujifilm Corporation, and Fujifilm North America Corporation are third-party defendants in this action.

exchange for royalties on sales of digital cameras manufactured by AO and incorporating Kodak patents. The second, an April 9, 2004 letter (the "Side Letter"), discusses the PLA and describes, <u>inter alia</u>, circumstances under which AO may not be required to pay Kodak a royalty on cameras it manufactures using Kodak patents.

Under § 4.2 of the PLA, AO is required to "pay Kodak . . . a second commuted royalty on the worldwide Net Sales of all OEM Licensed Products."[2]  The PLA defines "OEM Licensed Product"[3] as "Licensed Product sold or otherwise disposed of under tradename or trademark that is owned by a third party."[4]  In exchange for AO's promise to pay royalties, Kodak granted AO a right to use its "Kodak Patents" in manufacture and sales of digital cameras. The PLA defines "Kodak Patents" as "all classes or types of

---

[2] The PLA also provides for a royalty calculation based on sales of "Asia Optical Branded Licensed Products".  As of the date of the PLA, however, AO did not manufacture digital cameras under its own brand name, and the provisions of the PLA relating to Asia Optical Branded Licensed Products are not at issue here.

[3] "OEM" stands for "outside equipment manufacturer".

[4] The PLA defines "Licensed Product" as "Digital Camera(s)" minus exclusions not relevant here.  "Digital Camera" is itself a defined term in the PLA; neither party disputes, however, that the cameras manufactured by AO for Fuji are "digital camera(s)" within the terms of the PLA.  Likewise, for the purposes of this motion neither party disputes that the cameras AO manufactured for Fuji are "OEM Licensed Product[s]" within the meaning of the PLA.

patents . . . in all countries of the world which are owned or licensable by Kodak or its Subsidiaries during the term of this Agreement." The PLA specifies six patents, but notes that it is not limited to these patents. The list of specified patents includes U.S. Patent 5,016,107 (the "'107 Patent").

Section 5.6 of the PLA provides:

> In the case where Digital Cameras are sold by Asia Optical to an existing Kodak licensee under the Digital Camera Portfolio, and sold under that licensee's Trademark or Tradename, then it shall be presumed that Asia Optical shall be responsible for the royalty payment to Kodak for those Digital Cameras under this Agreement. However, if the existing licensee elects to pay Kodak, and pays Kodak in full, for Digital Cameras made and provided by Asia Optical[,] those Digital Cameras shall not be included in calculating Net Sales under this Agreement so long as that licensee pays in full Kodak royalties under its Agreement with Kodak. Asia Optical shall indicate on its royalty report the model Digital Cameras excluded from royalties due under this clause and the name of the existing Kodak Licensee responsible for payment of the royalty.

(Emphasis added). "Digital Camera Portfolio" is not a defined term in the PLA.

Finally, the PLA is an integrated agreement. It provides that the document "constitutes the entire Agreement between the parties with respect to the subject matter hereof. Any modification of this Agreement shall be set forth in writing and duly executed by both parties."

4

The parties made a written modification that same day.  On April 9, 2004, the parties executed the Side Letter.[5]  The first section of the Side Letter states: "The purpose of this letter is to clarify some of the language in Kodak's standard [PLA] as it pertains to Asia Optical, Inc."  The Side Letter proceeds through ten bolded subheadings, addressing various provisions of the PLA.  The fifth section of the Side Letter provides:

**5.  Which Licensee is obligated to pay the royalty?**
Kodak's policy is that the brand owner, if licensed, has the first option to pay the royalty or to transfer the royalty payment obligation to its supplier, if such supplier is licensed.  This option is set forth in Paragraph 5.6.  Almost all licensed brand owners have chosen to pay the royalty themselves.  Upon request, Kodak, [sic] will provide Asia Optical with a list of licensed brand owners who pay Kodak the royalty for all their branded product sales.  If the brand owner does not exercise the option to pay the royalty, a supplier who is the Original Design Manufacturer (ODM) has the responsibility to pay the royalty.  <u>Pure contract assembly without design responsibility, or simple provision of parts does not obligate Asia Optical to pay a royalty.</u>

(Emphasis added).  In its final section, titled "Name of Licensees", the Side Letter states:  "Kodak's current camera-selling licensees are Olympus, Sanyo, Konica (including Minolta, Casio Ricoh, Kyocera, and Samsung."  It does not list Fuji as a current licensee.

_____

[5] Although the Side Letter only bears a signature from a Kodak representative, AO contends that it is an effective modification of the PLA, and it will be treated as such for purposes of this motion.

Through an agreement dated April 21, 1995 (the "Fuji Agreement"), Kodak granted Fuji a license to two specific digital camera patents and an option to license a third.  One of the two Kodak patents licensed in the Fuji Agreement is the '107 Patent, designated in the agreement as the "Kodak Licensed Detachable Memory Cartridge Patent".[6]  Sections 3.1 and 3.2 of the Fuji Agreement grant Fuji a license to the '107 Patent, the other specific digital camera patent licensed to Fuji, and their "Corresponding Patents".  Section 1.8 defines "Corresponding Patents" as "all patents and examined applications which are based on and claim all or part of the same subject matter disclosed and claimed by" the specific patents licensed or optioned through the Fuji Agreement.  The Fuji Agreement was not royalty-bearing, and did not require Fuji to make any payment to Kodak in connection with the licensed Kodak patents.

In approximately 2005, after Kodak and AO signed the PLA, AO began making digital cameras as an OEM for Fuji.  AO has made no royalties payments to Kodak on its OEM digital camera sales to Fuji.

---

[6] The '107 patent expired in 2009.  The other specific patent licensed to Fuji in the Fuji Agreement expired before the PLA was signed.

Discussion

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect

7

the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

Kodak has moved for partial summary judgment on the proper interpretation of the PLA and Side Letter (collectively, the "AO Agreement").[7]  According to Kodak, there is no material factual dispute that the AO Agreement requires AO to pay royalties to Kodak on AO's digital camera sales to Fuji.  In effect, Kodak's motion presents two issues: whether it is unambiguous that (1) the last sentence of the fifth section of the Side Letter applies only in situations where AO performs pure contract assembly as an OEM for a licensee for Kodak's Digital Camera Portfolio; and if so, (2) whether Fuji was such a Kodak licensee.

---

[7] The PLA and Side Letter form an integrated agreement.  "Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together."  Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 233 (2d Cir. 1991).

The PLA contains a New York choice of law clause, and neither party contends that New York law does not govern this dispute.  Under New York law, "the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties."  Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (citation omitted).  "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous."  Id. "[W]hether a written contract is ambiguous is a question of law for the court."  JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources." Lockheed, 639 F.3d at 69.  Contract language presents no ambiguity where it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."  JA Apparel, 568 F.3d at 396 (citation omitted).  But, "the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  Lockheed, 639 F.3d at 69.

In determining whether a contract is ambiguous, the court must "read the integrated agreement as a whole." Id. (citation omitted). "If the document as a whole makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." Id. (citation omitted); see also JA Apparel, 568 F.3d at 397 ("In interpreting an unambiguous contract, the court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby.").

Under New York law, where a written agreement includes an integration clause, the effect is "to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." Primex Intern. Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599 (N.Y. 1997); see also Bank Julius Baer & Co., Ltd. v. Waxfield Ltd., 424 F.3d 278, 283 (2d Cir. 2005). "[T]he parol evidence rule forbids proof of an oral agreement that might add to or vary the terms of a written contract that was intended to embody the entire agreement between the parties." Albany Savings Bank, FSB v. Halpin, 117 F.3d 669, 672 (2d Cir. 1997) (citation omitted).

A.  Section 5 of the Side Letter:  Multiple Licensees

The parties dispute the proper interpretation of the final line of the fifth section of the Side Letter:  "Pure contract assembly without design responsibility, or simple provision of parts does not obligate Asia Optical to pay a royalty."  AO argues that, at the very least, this sentence creates an ambiguity as to whether AO's royalty obligation is forgiven when it performs "pure contract assembly" whether that work is performed for a Kodak licensee or not.  According to Kodak, the AO Agreement unambiguously requires AO to pay royalties unless AO performs contract assembly work for the kind of Kodak licensee described in § 5.6 of the PLA, that is, a licensee of the Kodak Digital Camera Portfolio.  Kodak is correct.

First, the last sentence of the Side Letter's fifth section unambiguously applies only to pure contract assembly sales AO makes to existing Kodak licensees.  This conclusion is compelled first and foremost by the structure and content of the Side Letter.  The Side Letter is organized into ten numbered sections, each beginning with a bolded section heading.  Not surprisingly, in each section, the text following the bolded heading relates directly to the scope of the bolded heading.[8]

---

[8] For example, the fourth numbered section is titled "**4. Components**", and discusses when digital camera component manufacture and sale requires a license but is not royalty-

The fifth section of the Side Letter is no exception; it begins: "**5. Which Licensee is obligated to pay the royalty?**" Here, the text, including the section's final sentence, relates to a situation involving multiple licensees, i.e. where AO is the OEM for a Kodak licensee under the Digital Camera Portfolio. That conclusion is buttressed by reference in the text of the section to § 5.6 of the PLA, which discusses AO's royalty obligation where AO acts as an OEM to a "an existing Kodak licensee under the Digital Camera Portfolio."  Furthermore, all preceding sentences in the fifth section of the Side Letter address royalty payments under scenarios where AO acts as supplier to an existing licensee who is making royalty payments. For instance, the third sentence notes that "[a]lmost all licensed brand owners have chosen to pay the royalty themselves."  Taken in context, the final sentence of the Side Letter unambiguously addresses AO's royalty obligation where AO performs pure contract assembly on behalf of an existing Kodak licensee under the Digital Camera Portfolio.

The reading urged by AO -- that AO owes no royalties to Kodak whenever it performs "pure contract assembly without design responsibility," regardless of whether it does so on

_____

bearing, and when it neither requires a license nor is royalty-bearing.

behalf of an existing Kodak licensee -- is at odds with the Side
Letter and the remainder of the AO Agreement.  The AO Agreement
licenses Kodak's digital camera patents to AO, and in exchange
AO promises to pay a "first commuted royalty" on sales of AO-
branded products and a "second commuted royalty" on OEM sales.
As acknowledged in the Side Letter (and thus part of the AO
Agreement), at the time of the AO Agreement there were no AO-
branded digital camera sales.  In entering the AO Agreement,
therefore, the parties principally licensed Kodak's digital
camera patents to AO for use in AO's OEM sales.  They did so in
exchange for royalty payments to Kodak.  While OEM sales
encompass both "pure contract assembly" sales and sales
involving some design responsibility on AO's part, an adoption
of AO's preferred interpretation would nullify a significant
part of the AO royalty obligation established in the AO
Agreement.  If the parties had intended such a far-reaching
exclusion, they would have given the exclusion prominence in the
AO Agreement and would not have effected it through a final
sentence in a paragraph which otherwise addresses AO's
obligations when it makes OEM sales to licensees for Kodak's
Digital Camera Portfolio.  Thus, while the final sentence of the
Side Letter's fifth section may be read in isolation to forgive
AO's royalty obligation where it performs pure contract assembly

13

for any third party, read in the context of its section, which addresses "[w]hich licensee is obligated to pay the royalty," and in the broader context of the integrated agreement as a whole, the sentence unambiguously applies only when AO performs pure contract assembly for a licensee for Kodak's Digital Camera Portfolio.

AO argues that the exclusion's lack of reference to a licensed brand owner renders it ambiguous. According to AO, several of the preceding sentences of the Side Letter's fifth section refer explicitly to licensed brand owners, even though the section's bolded heading should render such references redundant. While the final sentence could have specifically stated that it applied only to contract assembly on behalf of a licensee, it does not.

AO's observation is insufficient to render the exclusion ambiguous. The sentence immediately preceding the exclusion states: "If the brand owner does not exercise the option to pay the royalty, a supplier who is the Original Design Manufacturer (ODM) has the responsibility to pay the royalty." This sentence also does not specifically refer to licensed brand owners, yet AO admits that it refers to a "two-licensee situation". Again, read in context, the omission of an explicit reference to

14

licensed brand owners does not create an ambiguity in the paragraph's final sentence.

AO next argues that reading a two-licensee limitation into the "pure contract assembly" exclusion would render that exclusion meaningless.  The exclusion is not meaningless, however.  The AO Agreement provides that where AO performs OEM sales with some design responsibility for a licensee under the Digital Camera Portfolio, AO must pay a royalty to Kodak if the licensee brand owner does not exercise its option to pay the royalty on the sales.  But if AO only performs "pure contract assembly without design responsibility, or simple provision of parts" for such a licensee, then Kodak will not pursue AO for a royalty on sales of the OEM product.

Finally, AO argues that the AO Agreement is ambiguous because the terms of the PLA and the Side Letter relating to AO's royalty obligations are inconsistent.  While irreconcilable inconsistencies in the text of an integrated agreement may render the agreement ambiguous and justify resort to extrinsic evidence, see, e.g., Collins v. Harrison-Bode, 303 F.3d 429, 433-434 (2d Cir. 2002) (defined term used inconsistently throughout integrated agreement rendered contract ambiguous), there is no such inconsistency here.  Section 5.6 of the PLA discusses AO's royalty obligation to Kodak where AO acts as an

OEM for a licensee of Kodak's Digital Camera Portfolio.  It
states that AO will be presumed to be responsible for the
royalty payment to Kodak for OEM sales to such licensees, but
that the other licensee may elect to pay the royalty to Kodak
and relieve AO of the obligation.  The first paragraph of the
Side Letter states that the Side Letter's "purpose . . . is to
clarify some of the language in Kodak's standard [PLA] as it
pertains to [AO]."  To that end, the fifth section of the Side
Letter addresses the issue raised in § 5.6 of the PLA: whether
AO is obliged to pay a royalty to Kodak on its OEM sales to
licensees of the Kodak Digital Camera Portfolio.  The Side
Letter "clarif[ies]" that Kodak will look first to the licensed
brand owner to pay the royalty, but if the brand owner does not
pay the royalty, Kodak will hold AO to its royalty obligation.
If, however, AO performs only "pure contract assembly, without
design responsibility, or simple provision of parts" for the
existing Kodak licensee, AO will not be obliged to pay a royalty
on digital camera sales associated with the transaction.  Read
as an integrated agreement, the AO Agreement does not
demonstrate internal inconsistencies irreconcilable without
resort to extrinsic evidence.

B. Was Fuji a Kodak Licensee for Purposes of Section Five of the Side Letter?

To prevail on its summary judgment motion, Kodak must also show that there is no material factual dispute that Fuji was not a Kodak licensee, as that term is defined in the AO Agreement. Kodak contends that pursuant to the terms of the AO Agreement, AO was obligated to pay a royalty unless it engaged in pure contract assembly for a licensee of the Kodak Digital Camera Portfolio. Since it is undisputed that Fuji did not have such a broad license, Kodak contends that AO owes it royalties. Kodak is again correct.

The parties do not dispute the essential terms of the license arrangement between Kodak and Fuji that prevailed during the term of the AO Agreement. The 1995 Fuji Agreement was in effect between Fuji and Kodak at all relevant times. The 1995 Fuji Agreement licensed at least two Kodak digital camera patents to Fuji, with an option on a third. One of the two licensed patents -- the '107 Patent -- was included among those licensed to AO through the AO Agreement. It is also undisputed that the 1995 Fuji Agreement was not royalty-bearing, and that it did not give Fuji a license for all of Kodak's Digital Camera Portfolio of patents. As of that time the portfolio was composed of over 1,000 patents.

17

The next issue raised by this motion, therefore, is whether such a limited license between Fuji and Kodak could be the kind of license to which the Side Letter refers in its fifth section. The fifth section of the Side Letter uses the terms "Licensee" and "licensed" but does not define them.  Instead, the Side Letter gives a list of Kodak's current camera-selling licensees. Fuji is not included in this list of names at the end of the Side Letter.  The fifth section of the Side Letter also refers to § 5.6 of the PLA.  Section 5.6 of the PLA describes "case[s] where Digital Cameras are sold by [AO] to an existing Kodak licensee under the Digital Camera Portfolio, and sold under the licensee's Trademark or Tradename[.]"  (Emphasis added.)

The term "Digital Camera Portfolio" is undefined in the AO Agreement.  Where a contractual term is undefined, a court may resort to dictionary definitions to ascertain its ordinary meaning.  See, e.g., TIFD III-E, Inc. v. United States, 666 F.3d 836, 843 & n.3 (2d Cir. 2012); United States v. Gravel, 645 F.3d 549, 551 (2d Cir. 2011).  The Merriam-Webster Online Dictionary defines "portfolio" to mean, variously, "the securities held by an investor : the commercial paper held by a financial house (as a bank)", or "a selection of a student's work (as papers and tests) compiled over a period of time and used for assessing performance or progress".  Merriam-Webster Online Dictionary,

18

http://merriam-webster.com/dictionary/portfolio (last accessed March 13, 2012).  Dictionary.com Unabridged similarly defines "portfolio" to mean "the total holdings of the securities, commercial paper, etc., of a financial institution or private investor".  Dictionary.com Unabridged, http://dictionary.reference.com/browse/portfolio (last accessed March 13, 2012).  Black's Law Dictionary offers the following definition:  "The various securities or other investments held by an investor at any given time."  Black's Law Dictionary (9th ed. 2009).  In ordinary usage, therefore, the term "portfolio" in connection with Kodak's digital camera patents means a comprehensive, complete, or at least representative set of those patents, which number over a thousand.  The Fuji Agreement licenses only two of Kodak's digital camera patents, with an option on a third.  Fuji therefore cannot be a licensee of the Kodak "Digital Camera Portfolio" under any reasonable meaning of that term as it is used in the context of the AO Agreement.

This reading of the AO Agreement is the most natural reading of § 5.6 of the PLA, the fifth section of the Side Letter, and the remaining terms of the AO Agreement.  Under the AO Agreement, AO was given a broad license to manufacture digital cameras using any Kodak patent for digital cameras.  Literally, with a few defined exceptions, this right encompassed

19

"all classes or types" of Kodak patents "in all countries of the world."  Even when AO sold a camera to a company with a Kodak license under the Digital Camera Portfolio, it was presumed that AO would be responsible for the royalty payment to Kodak that was set by the PLA.  The AO Agreement acknowledged, however, that Kodak was not entitled to payment of a double royalty.  If a licensee under the Digital Camera Portfolio paid royalties to Kodak for the cameras made by AO, then AO was relieved of any obligation to pay Kodak.  The Side Letter further explained that almost all such licensees had chosen to pay the royalties themselves, and gave AO the benefit of a further carve-out from its obligation to pay royalties in the event that it did pure contract assembly for a licensee holding a license for the Kodak Digital Camera Portfolio.

AO's alternative reading of the AO Agreement is neither supported by the language of the documents nor reasonable.  Under AO's reading, Kodak gave AO a broad right to use Kodak's digital camera patents but demanded no royalty from it when it performed contract assembly work for a party that did not pay royalties to Kodak.  If that had been the intent of the parties, that intent would have been clearly expressed.

C.   AO's Remaining Arguments

AO's remaining arguments for why partial summary judgment should not be granted are likewise unavailing.  First, AO argues that it owes no royalties on the digital camera sales to Fuji because AO assembled and sold the cameras in China.  According to AO, the AO Agreement licenses "Kodak Patents", which are limited in § 1.10 of the agreement to those "classes or types of patent rights in all countries of the world which are owned or licensable by Kodak[.]"  That limitation, AO argues, is reinforced in § 3.3, which provides:  "Nothing herein shall be construed as preventing or restricting either party from manufacturing, using and selling any product in any country or territory[.]"  Therefore, according to AO, the AO Agreement does not cover sales in countries where Kodak does not have patent rights, and Kodak has not demonstrated it has relevant digital camera patents in China.

Section 4.2(a) of the AO Agreement, however, provides that AO "shall pay to Kodak . . . a second commuted royalty on the worldwide Net Sales of all OEM Licensed Products."  (Emphasis added.)  This language is unambiguous:  AO owes a royalty on global sales, regardless of the status of Kodak's patent rights in the country where the sale takes place.  Section 1.10's definition of "Kodak Patents", limited to those patent rights

21

that Kodak actually possesses, does not render AO's clear royalty obligation for "worldwide Net Sales" ambiguous.

AO next argues that its affirmative defense of patent misuse renders summary judgment inappropriate. "[T]here are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 136 (1969). Among these limitations, patent leverage may not "be used to garner as royalties a percentage share of the licensee's receipts from sales of other products [not derived from the patented technology]." Id. But, "[i]f convenience of the parties rather than patent power dictates [a] total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license." Engel Indus., Inc. v. Lockformer Co., 96 F.3d 1398, 1408 (Fed. Cir. 1996) (citing Zenith, 395 U.S. at 138); see also Glen Mfg. Inc. v. Perfect Fit Indus., Inc., 420 F.2d 319, 321 (2d Cir. 1970). "[T]he voluntariness of the licensee's agreement to the royalty provisions is a key consideration" in determining whether a total-sales royalty provision resulted from the patentee's economic coercion, constituting patent misuse, or whether the parties agreed to the terms based on mutual convenience. Engel, 96 F.3d at 1408.

22

Even assuming Kodak does not have relevant digital camera patents in China,[9] the worldwide royalties provision of the AO Agreement does not constitute patent misuse.  Section 4.2(a) of the AO Agreement specifically states that the parties agree to royalties on "worldwide Net Sales" for their "mutual convenience", citing the "administrative burden and cost of determining" what constitutes "Licensed Product[s]".  There is no assertion in either AO's pleadings or its summary judgment opposition papers that AO's agreement to pay a royalty on its total sales was either involuntary or the result of an improper use of market power by Kodak.

---

[9] In reply, Kodak submits records of several patents registered with the State Intellectual Property Office of the People's Republic of China, including: (1) Publication No. 1261170 ("Method and apparatus for remedying parts of images by color parameters") (published July 26, 2000); (2) Publication No. 1447589 ("System for seizing and filing moving video [se]gment") (published Oct. 8, 2003); (3) Publication No. 1514399 (Imaging method and system for healthy monitoring and personal safety") (published July 21, 2004).

Conclusion

    Kodak's December 16 motion for partial summary judgment is granted.

        SO ORDERED:

Dated:    New York, New York
          March 16, 2012

                        DENISE COTE
            United States District Judge